THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JERRY SICKLES, Defendant-Appellant.

Third District   No. 77-17

Opinion filed December 13, 1977.

Robert Agostinelli and Mary Robinson, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward Petka, State's Attorney, of Joliet (Edward A. Burmila, Jr., Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

On January 14, 1976, the defendants, Jerry Sickles and John Nieto, were indicted for the unlawful delivery of more than 200 grams of a substance containing amphetamines, and Mary Mancl, also a defendant, was indicted for aiding and abetting the delivery. Following a jury trial at which all of the defendants were found guilty, each defendant was sentenced to a term of imprisonment of not less than 4 years nor more than 4 years and 1 day. The three defendants appeal from this adverse determination. However, the appeal of Sickles is separate from the appeal of Nieto and Mancl. This opinion will deal with the general issue concerning the admissions instruction raised by the defendant Sickles. Since that issue is also raised by Nieto and Mancl, this opinion will resolve the issue for both appeals. A separate opinion, *People v. Mancl* (3d Dist. 1977), 55 Ill. App. 3d 41, 370 N.E.2d 664, will deal with the other issues raised by the appeal of Mancl and Nieto.

The heart of the State's case was presented through the testimony of Steve Egan, a Joliet police officer assigned to undercover work with the Metropolitan Area Narcotics Squad (MANS) at the time of the alleged offense. Egan testified that he first came to know John Nieto on May 29, 1974, when introduced to him by one Roy Flentge. On June 24, 1975,

Egan received a message at the MANS office that Nieto had called. Egan returned the call and pursuant to offers by Nieto, agreed to purchase 1000 "speeders" (amphetamines) for $200. Shortly thereafter, Nieto called back to tell Egan his connection had brought the drugs and he could come over in a half hour to make the purchase.

Egan proceeded to Nieto's house at 3:40 p.m. bringing with him $200 in prerecorded funds. He went directly to the kitchen where Mary Mancl was sitting at the table counting out small white tablets. Egan asked if that was his 1000 and Nieto replied no, reached into the freezer and handed him a plastic bag containing white tablets similar to those Mancl was counting. Egan gave Nieto the $200 and then asked if he would be able to get another 6000 tablets. Nieto picked up the phone and had a conversation which Egan did not overhear. After the conversation, he reported that the party would call back to let them know if that kind of quantity could be arranged. The phone rang a few minutes later, and while still on the line, Nieto asked Egan if 10 p.m. and a price of $850 would be agreeable. Egan agreed and Nieto told the party on the line, "O.K." After Nieto informed Egan that his connection would be over at 10 p.m. Egan left.

Egan returned to Nieto's house at about 10 p.m. bringing with him $860 in prerecorded funds. Nieto represented that his connection had not yet arrived. Egan waited in the house until about 10:45 p.m. During that wait, Nieto made a call and then told Egan that his connection was waiting for the stuff to be brought to him. At about 10:45 p.m., a white male accompanied by a child and carrying a rolled up, paper bag entered the house. Egan identified Jerry Sickles as that man. Sickles went directly to the kitchen. Nieto then came out of the kitchen to the living room where Egan was waiting and asked if he had the money. Egan responded affirmatively, walked to the kitchen and counted out the prerecorded funds. Egan was unsure where Sickles was at this time. He asked where the "speeders" were and Nieto indicated the counter top. Egan saw a bag, which appeared to be the same as the one Sickles had brought, picked it up and turned back to see Nieto and Sickles go off to the bedroom. He then opened the paper bag and lifted out a plastic bag containing tablets. Mancl, who was sitting at the kitchen table, asked how many he thought were in the bag and he responded there was supposed to be 6000 but he was not going to count them. Mancl then said if he was short, he should let Sickles know. This testimony was admitted over the hearsay objection of counsel for Sickles.

Sickles returned to the kitchen with some money in hand that he appeared to be counting. He told Egan that if he was short, to let him know because that was how his man worked. When asked how he could be reached, Sickles told Egan to go through Nieto. Egan recalled that the

statement was made in Mary Mancl's presence. Sickles then left. Mary Mancl left the kitchen and came back with $10 in change that Egan had coming to him.

Egan then left the house, and with other agents and uniformed police, returned to the house and placed Nieto, Mancl and three other males who had been present under arrest. Egan and some of the others then proceeded to an address produced by a license check run on the car in which Sickles left. There Sickles was arrested, and Egan found $120 of the prerecorded funds from the evening transaction in Sickles' pocket.

Egan returned to Nieto's house where Agent Malinowski was in possession of money taken from Nieto. The funds were checked against the money lists and the agents found that $200 consisted of prerecorded bills from the afternoon transaction and $120 from the evening transaction. The remaining $620 in prerecorded bills was never recovered.

At the completion of Egan's testimony, counsel for Sickles renewed a motion that evidence concerning the afternoon transaction be limited, and the court granted the motion. Before testimony resumed, the court instructed the jury that it was not to consider any such evidence against Jerry Sickles.

Each of the defendants testified in their own defense. Sickles testified that, on June 24, 1974, he was babysitting for a friend when Roy Flentge came to his apartment and asked to borrow his car. He knew Flentge casually, and had met him through John Nieto. Sickles told Flentge he did not lend his car. Flentge then asked for a ride to Nieto's (without explaining for what purpose) and Sickles agreed. The two went downstairs with the child in tow and someone from the bar called Flentge. Sickles got into his own car and Flentge came over to explain that the person from the bar was helping him fix his car. He asked Sickles to take a package to Nieto's, and Sickles acquiesced.

Sickles said when he arrived at Nieto's house, he walked in, placed the package on the counter in the kitchen and went immediately to the bathroom. When he emerged, Nieto called him into the bedroom and gave him $120. When Sickles asked what the money was for, Nieto told him Flentge would come by his house to pick it up. Sickles then left the house and, as he was walking to his car, a person he knew only vaguely called him over to a parked Chevy. The person told him that Flentge had gotten his car fixed, would not be at the bar, and would come by Sickles' place later. Sickles said fine, got into his own car and drove home.

Sickles further testified that, although he had seen Egan at Nieto's house, he had no conversation with Egan. Sickles was under the impression that the bag contained firecrackers, and he explained he was surprised to receive $120, thinking that was pretty expensive for firecrackers.

Nieto testified that he first met Egan through Roy Flentge who left a package (which he later told Nieto contained marijuana) for Egan at Nieto's house. Nieto next saw Egan on June 24, 1974, when Egan persuaded him to call Flentge and arrange to get him some speed. Flentge brought over the first 1000 pills in the afternoon and put them in Nieto's freezer. When Egan arrived later to pick up the pills, he asked about getting more and Nieto called Roy Flentge in his presence and made arrangements for the evening.

Nieto said Egan returned at 10 p.m. At Egan's request, he again called Flentge to see about the delay, Flentge told him he was having car trouble and would have someone bring the package over. He also told Nieto to give the person $120 to bring back for car repairs and to keep the rest of the money which Flentge would pick up later. When Jerry Sickles arrived, he said he had the package Flentge had asked him to bring over.

Mancl testified that she knew nothing about the alleged transaction and had been cooking and watching the baby while Egan was in the house that day. On cross-examination, Mancl testified that she heard no conversations between Sickles and Egan.

At the conference on instructions, the defense objected to IPI Criminal No. 3.06 concerning admissions which was tendered by the State on the theory that testimony given by the defendants as well as various statements made by the defendants during the transactions constituted admissions. The objection was overruled. A companion instruction, IPI Criminal No. 3.08, limiting the consideration of admissions to the defendant who made them, was also given over a defense objection.

The only issue raised for our consideration in this opinion is whether the trial court erred by giving the admissions instruction. In dicta, the Illinois Appellate Court for the Fifth District has recommended that IPI Criminal No. 3.06 be given only in reference to out-of-court admissions. (*People v. Price* (5th Dist. 1975), 32 Ill. App. 3d 610, 336 N.E.2d 56.) Although the testimony of Egan presents several out-of-court admissions of the defendants to the jury, we need not now decide whether the *Price* dicta establishes the only appropriate application of IPI Criminal No. 3.06. Where there is evidence otherwise in the record to support the giving of the instruction, IPI Criminal No. 3.06 ought to be given.

■▌ However, the defendants contend that the definition of admission does not include any statement made during the transaction for which the defendants are being tried. In *People v. Hanson* (3d Dist. 1977), 44 Ill. App. 3d 977, 359 N.E.2d 188, this court distinguished "confessions" from other statements or declarations of independent facts from which guilt may be inferred. In that case, statements made during the transaction were not considered confessions. Where a confession is a "voluntary acknowledgment of guilt after the perpetration of an offense" (*People v.*

*Stanton* (1959), 16 Ill. 2d 459, 466, 158 N.E.2d 47, 51), "[a]n admission is a statement by an accused of fact or facts which, when taken in connection with proof of other facts, may lead to an inference of guilt of the crime charged, but from which guilt does not necessarily follow." *People v. Kurzydlo* (1st Dist. 1974), 23 Ill. App. 3d 791, 795, 320 N.E.2d 80, 84.

■■ ■ Sickles argues that an admission must be a post-offense statement because the jury would believe it to be an after the fact concession of involvement. Mancl and Nieto attempt to get us to adopt the same definition by stretching our decision in *People v. Hanson* (3d Dist. 1977), 44 Ill. App. 3d 977, 359 N.E.2d 188. While recognizing the distinction between confessions and admissions, Mancl and Nieto contend that, because in *Hanson* we said confessions can only occur post-offense then an admission can not occur during the course of the offense. The reliance on *Hanson* is misplaced. Obviously, one cannot confess to a crime until the crime has been committed. However, an admission may occur during a transaction, or even prior thereto. For example "I intend to rob a bank" is a pre-offense admission which may be used against a defendant who is charged with robbing a bank. Since an admission is not necessarily a post-offense concession of involvement and since the jury could find certain admissions by the defendants, the trial court did not err by giving IPI Criminal No. 3.06. Moreover, this conclusion cannot be shaken merely by raising a supposition, specifically that the jury might misconstrue the word admission. The record does not disclose such a misconstruction.

■■ Lastly, it should be made clear that, where IPI Criminal No. 3.08 is given in addition to No. 3.06, a defendant who has not made such an admission has no standing to challenge on appeal the giving of No. 3.06 when a co-defendant's statement is challenged as not being an admission. (See *People v. Horton* (1st Dist. 1975), 35 Ill. App. 3d 208, 340 N.E.2d 700, *rev'd as to another defendant* (1976), 65 Ill. 2d 413, 358 N.E.2d 1121.) The defendants challenge the logic of giving IPI Criminal No. 3.08 where the defendants are being tried for conspiracy. First, this is not a conspiracy case. Secondly, the instruction was obviously designed to be used in a joint trial where only one or less than all of the defendants made an admission. As such, it would be unfair to the defendant who made no admission to fail to give No. 3.08. Thirdly, the jury could find that each of these defendants made an admission. As a result, we find that the trial court properly gave IPI Criminal No. 3.06 and No. 3.08.

Accordingly, the judgment of the Circuit Court of Will County is affirmed.

Affirmed.

STENGEL, P. J., and SCOTT, J., concur.